**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION & RETIREMENT SYSTEM and THE PENSION TRUST FUND FOR OPERATING ENGINEERS, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>RAYONIER ADVANCED MATERIALS, INC., PAUL G. BOYNTON, FRANK A. RUPERTO, and BENSON K. WOO,<br><br>Defendants. | CIVIL ACTION NO. 3:15-cv-546-J-32PDB<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS


I. INTRODUCTION .......... 2

II. PARTIES .......... 5

A. Lead Plaintiffs .......... 5

B. Defendants .......... 6

1. Rayonier Advanced Materials .......... 6

2. The Individual Defendants .......... 6

III. BACKGROUND AND NATURE OF THE FRAUD .......... 7

A. The RYAM Spinoff: "Operations Are Largely Unchanged" .......... 7

1. Rayonier Spins Off RYAM Amidst Market Uncertainty And Doubt .......... 7

2. Boynton And His Cohorts Jump Ship To RYAM At The Last Minute To Save Themselves .......... 9

B. Rayonier Pawns Off Its Liabilities On RYAM – Both Known And Unknown .......... 12

1. Rayonier Leaves RYAM Massively Leveraged And Saddled With Debt 12

2. RYAM Is Left Liable For Environmental Remediation Costs .......... 16

3. Rayonier's Demonstrated History Of Pollution Results In Extensive Environmental Liabilities That Were Known To Senior Executives .......... 18

i. Rayonier Fails To Comply With Its Remediation Obligations Under Federal Law .......... 19

ii. Rayonier Knowingly Understates Its Liabilities At Its Port Angeles, Washington Site .......... 22

iii. RYAM's Shareholders And Interest Groups Push For Transparency Regarding Environmental Reserves, But Are Rebuffed .......... 29

IV. THE TRUTH IS REVEALED .......... 32

V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS .......... 39

A. False Statements Regarding RYAM's Environmental Remediation Costs .......... 39

B. False Statements Regarding RYAM's Site-Specific Obligations .......... 41

C. False Statements Regarding Accounting Estimates ........ 44

D. False Statements Regarding Sarbanes-Oxley Certifications ........ 46

VI. DEFENDANTS' GAAP VIOLATIONS ........ 47

VII. LOSS CAUSATION ........ 49

VIII. STATUTORY SAFE HARBOR ........ 51

IX. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ........ 52

X. JURISDICTION AND VENUE ........ 53

XI. CLASS ACTION ALLEGATIONS ........ 53

XII. COUNTS AGAINST DEFENDANTS UNDER THE EXCHANGE ACT ........ 55

XIII. PRAYER FOR RELIEF ........ 59

XIV. JURY DEMAND ........ 59

**TABLE OF ABBREVIATIONS AND ACRONYMS**

| | |
|---|---|
| 2002 Agreed Order | Order No. DE 02SWFAPSR-4570 with Department of Ecology, dated July 30, 2002 |
| 2004 Agreed Order | Order No. DE 04SWFAPSR-6025 with Department of Ecology, dated March 11, 2004 |
| 2010 Agreed Order | Order No. DE 6815 with Department of Ecology, dated January 19, 2010 |
| 2010 Notice of Violation | Notice of Violation issued by EPA dated February 4, 2010 |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act of 1980, a/k/a Superfund |
| CS | Cellulose Specialties |
| Department of Ecology | State of Washington Department of Ecology |
| EPA | Environmental Protection Agency |
| EPA Consent Agreement | Consent Agreement signed with EPA dated December 7, 2011 |
| ESC | Environmental Stewardship Concepts |
| GAAP | Generally Accepted Accounting Principles |
| Information Statement | Exhibit 99.1 to RYAM's June 18, 2014 Form 8-K. |
| PLP | Potential Liability Person |
| PwC | Price Waterhouse Coopers |
| Rayonier | Rayonier Inc. |
| Rayonier AM | Rayonier Advanced Materials, Inc. |
| RBC | RBC Capital Markets |
| RCRA | Resource Conservation Recovery Act |
| RYAM | Rayonier Advanced Materials, Inc. |
| SWP | Southern Wood Piedmont Co. |
| SWP Sites | Augusta, Georgia; Spartanburg, South Carolina; East Point, Georgia; and Baldwin, Florida |
| WAC | Washington Annotated Code |

Lead Plaintiffs The Pension Trust Fund For Operating Engineers ("Operating Engineers") and Oklahoma Firefighters Pension & Retirement System ("Oklahoma Firefighters") (collectively, "Lead Plaintiffs" or "Pension Funds") bring this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of themselves and all other persons or entities who purchased or otherwise acquired the common stock of Rayonier Advanced Materials, Inc. ("RYAM" or the "Company") during the period June 30, 2014 through January 27, 2015, inclusive (the "Class Period"), and who were damaged thereby (the "Class").

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on the independent investigation of their undersigned counsel. This investigation includes review and analysis of (i) RYAM's public filings with the Securities and Exchange Commission (the "SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of RYAM's conference calls with analysts and investors; (iv) presentations, press releases, and reports; (v) news and media reports concerning the Company and other facts related to this action; (vi) data reflecting the pricing of RYAM common stock; (vii) consultations with relevant experts; and (viii) other material and data concerning the Company, as identified herein. Counsels' investigation into the factual allegations continues, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

## I. INTRODUCTION

1. This is a securities fraud class action on behalf of investors who purchased or acquired (via spinoff) the common stock of Rayonier Advanced Materials ("RYAM") between June 30, 2014 and January 27, 2015, inclusive (the "Class Period"). The Defendants are RYAM, its current CEO, Paul Boynton, its current CFO, Frank Ruperto, and its former CFO, Benson Woo. The claims arise from RYAM's massively understated reserve for environmental liabilities, which Defendants fraudulently concealed from investors.

2. Prior to its June 2014 spinoff, RYAM existed as the Performance Fibers Division of Rayonier Inc. In the years leading up to the spinoff, Rayonier was a Pandora's Box of undisclosed negative information. First, its Forestry Division had been overharvesting its prized Northwestern assets for nearly a decade, which would ultimately result in a November 2014 restatement of its financial results and a significant reduction of its harvesting for the next decade. The Performance Fibers Division also faced stiff headwinds. Rayonier spent over $380 million to increase production of Performance Fiber's premium cellulose products at a time when worldwide demand was sagging and other companies were entering the market and eating away at margins. Most significantly, Rayonier (including Performance Fibers) had accumulated massive environmental liabilities that would end up significantly increasing remediation expenses beyond those disclosed to investors.

3. At the heart of all of these problems was Paul Boynton, then-CEO of Rayonier and future CEO of RYAM. Prior to becoming CEO of Rayonier, Boynton was the head of Performance Fibers, and was often lauded for his in-depth knowledge of that business. As Rayonier's CEO, Boynton and his management team conducted a two-year, "in-depth analysis"

that included "a thorough review of [Rayonier's] business."[1] This review resulted in two major outcomes: the January 2014 announcement of Performance Fibers' spinoff from Rayonier, and Rayonier's November 2014 accounting restatement. Boynton had to act quickly in the wake of this review. Rather than admit that Rayonier overharvested its trees for a decade while he was at its helm, Boynton threw in his lot with the struggling Performance Fibers Division and announced that he would become the new CEO and Chairman of RYAM.

4. In order to effectuate the spinoff and live to fight (and ultimately, lose) another day, Boynton and his management team had to hide material information from RYAM investors. As part of the spinoff, RYAM was forced to assume all environmental liabilities for former operations sites. Despite assuring investors that reserves for these liabilities were not likely to change significantly – and indeed, they had gone down every year since at least 2002 – RYAM knew that the reserves were massively understated due in large part to significant remediation costs that the Company was facing at its former operations site in Port Angeles, Washington. Making matters worse, RYAM was forced to take on nearly $1 billion in debt to effectuate the spinoff. RYAM's struggling ability to service this debt resulted in the Company kicking the environmental liability reserve can down the road as long as it could. If Defendants were truthful with investors about the true financial condition of the company prior to and at the time of the spinoff, the spinoff may not have happened.

5. Tellingly, within weeks of the spinoff, Rayonier's new CEO, a 30-year veteran of the forestry industry who had not previously worked at Rayonier, quickly and easily uncovered

[1] *See* January 27, 2014 Rayonier Form 8-K at Ex. 99.2 (Defendant Boynton stating "we began *in-depth analysis* and preparation for the business separation almost *two years* ago"); *See also* Paul Boynton, Rayonier 2Q 2013 earnings call, January 27, 2014 (Defendant Boynton stating "[b]eginning almost *two years* ago, senior management and our Board of Directors undertook a *thorough review of the company's businesses* and strategic alternatives in order to assess options to maximize long-term shareholder value").

the fact that Rayonier had been overharvesting for a decade under Boynton. RYAM investors learned for the first time of the issues that Rayonier was facing under Boynton's watch, and now questioned his stewardship over RYAM, causing the Company's share price to plummet over 10% and wiping out $75 million of market capitalization in the process. It did not bolster faith in RYAM's management when, only weeks later, Boynton's handpicked CFO quickly and mysteriously resigned to the consternation of analysts everywhere.

6. Shortly after Rayonier restated its financials, and only after Boynton secured his spinoff bonus, RYAM finally disclosed that its environmental liabilities were grossly under-reserved and that it would be more than doubling the reserve when compared to at the time of the spinoff just six months earlier. This revelation shocked the market, causing RYAM's share price to plummet nearly 10%, and instantly erasing another $75 million in market capitalization:



## II. PARTIES

### A. Lead Plaintiffs

7. Lead Plaintiff The Pension Trust Fund For Operating Engineers is a defined-benefit pension plan based in Alameda, California. Operating Engineers provides retirement, disability, survivor, and other benefits to more than 37,000 heavy equipment operators, construction workers, public employees, retirees, and their dependents in Northern California, Northern Nevada, Hawaii, and Utah. As of December 2014, Operating Engineers managed more than $3.7 billion in assets. As set forth in its certification filed on July 6, 2015 (Dkt. No. 14-2) and incorporated herein by reference, Operating Engineers purchased RYAM common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. On August 10, 2015, the Court appointed Operating Engineers as Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).

8. Lead Plaintiff Oklahoma Firefighters Pension & Retirement System was established in 1981 as the public pension system for firefighters in the state of Oklahoma. As of August 13, 2015, Oklahoma Firefighters held over $2 billion in net assets for the benefit of over 23,000 members who have actively participated in firefighting activities in the state of Oklahoma. As set forth in its certification filed on July 6, 2015 (Dkt. No. 14-2) and incorporated herein by reference, Oklahoma Firefighters acquired RYAM common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. On August 10, 2015, the Court appointed Oklahoma Firefighters as Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).

**B. Defendants**

**1. Rayonier Advanced Materials**

9. Defendant Rayonier Advanced Materials is a Delaware corporation with its principal executive offices located at 1301 Riverplace Boulevard, Jacksonville Florida. RYAM previously existed as the Performance Fibers Division of Rayonier. RYAM's business consists of producing cellulose and cellulose-based products.

**2. The Individual Defendants**

10. Defendant Paul G. Boynton ("Boynton") has served as Chairman of the Board of Directors, as well as President and Chief Executive Officer of RYAM since June 27, 2014. Defendant Boynton previously served as Chairman, President, and CEO of Rayonier, Incorporated. Boynton joined Rayonier in 1999 as director of sales and marketing. Defendant Boynton was the CEO of Rayonier from January 1, 2012 to June 27, 2014, President from October 1, 2010 to June 2014, Chief Operating Officer from October 1, 2010 to 2011 and Chairman from May 17, 2012 to June 2014. Defendant Boynton became Senior Vice President of the Performance Fibers Division in 2002.

11. Defendant Frank A. Ruperto ("Ruperto") currently serves as Chief Financial Officer and Senior Vice President, Finance and Strategy of RYAM. Following the spinoff, Ruperto served as Senior Vice President, Corporate Development and Strategic Planning for RYAM. In November of 2014, he was appointed to his current position. He previously served as Senior Vice President, Corporate Development and Strategic Planning, of Rayonier, Inc.

12. Defendant Benson K. Woo ("Woo") served as Senior Vice President and CFO of RYAM from June 27, 2014 until November 30, 2014. Defendant Woo joined Rayonier less than three weeks before the execution of the RYAM spinoff, and served as the Chief Accounting Officer of Rayonier from June 9, 2014 to June 27, 2014.

## III. BACKGROUND AND NATURE OF THE FRAUD

### A. The RYAM Spinoff: "Operations Are Largely Unchanged"

#### 1. Rayonier Spins Off RYAM Amidst Market Uncertainty And Doubt

13. Rayonier Advanced Materials manufactures high-value cellulose products that are sold worldwide for use in various industrial applications and to produce a variety of consumer products ranging from cigarette filters to foods, pharmaceuticals, textiles and electronics. RYAM has been operating as an independent company since June 27, 2014, when the spinoff from Rayonier was consummated. As part of the spinoff shareholders received one share of RYAM common stock for every three shares of Rayonier common stock that they held. RYAM began active trading on the New York Stock Exchange on June 30, 2014.

14. Prior to the spinoff, RYAM existed as the Performance Fibers Division of Rayonier. From 2002 through 2009, Boynton headed the Performance Fibers Division, first as Senior Vice President, Performance Fibers and then as Senior Vice President, Performance Fibers and Wood Products. The Performance Fibers Division was historically Rayonier's most profitable business segment, accounting for over 60% of its revenue since 2008.

15. Cracks, however, were beginning to appear in the Performance Fibers façade leading up to the spinoff. An October 25, 2013 report from Buckingham Research Group entitled, "Trim '14 Est & Price Target As Performance Fibers Outlook Gets Cloudy," noted that Senior Vice President of Performance Fibers Jack Kriesel indicated that softness in the European market combined with low cellulose prices were "contributing to downward price pressure in the market."

16. Buckingham's concerns over Performance Fiber's deteriorating business were shortly echoed by RBC and Deutsche Bank. In a November 18, 2013 report entitled, "Dissolving Doubts—Time to Step In," RBC cited concerns similar to those cited by

Buckingham, prior to concluding "what went up should go down." On November 20, meanwhile, Deutsche Bank noted that as a result of declining prices of its premium products, Performance Fibers would have to sell more of its commodity pulp product at lower margins, thus negatively impacting revenues and profits.[2] JP Morgan cited these building negative trends and warned investors of "a multi-year pricing headwind" where "fundamentals could be challenged for some time."[3] Similarly, *Seeking Alpha* warned that because Performance Fibers was facing "major headwinds," investors "should wait for earnings momentum to improve before buying Rayonier."[4]

17. Against this background of Performance Fiber's waning fortunes, on January 27, 2014, Rayonier announced that it was planning a spinoff of the Performance Fibers Division. Boynton (who at the time was CEO of Rayonier) explained that planning for the spinoff began almost two years earlier with an "in-depth analysis and preparation for the business separation" that was part of Rayonier's "strategic planning process."[5] As part of this process, Rayonier's senior management and Board "undertook a thorough review of the company's businesses and strategic alternatives. . . ."[6] Boynton later boasted to analysts on the 2Q 2013 earnings call of the "rigorous analysis" and the "great deliberation" performed by senior management during this period.

---

[2] *Deutsche Bank-Markets Research*, "Boosting Rating from Sell to Hold; Maintaining $47 PT," (November 20, 2013).

[3] *J.P. Morgan – North America Equity Research*, "Cellulose Specialties a 'Show Me' Story; Initiate Coverage at Underweight," (December 12, 2013).

[4] *Seeking Alpha*, "Zacks' Bear of the Day: Rayonier," (Jan. 14, 2014).

[5] January 27, 2014 Rayonier Form 8-K at Ex. 99.2.

[6] Paul Boynton, Rayonier 2Q 2013 earnings call (January 27, 2014).

18. The time was right to spin off Performance Fibers from Rayonier, Boynton explained, because:

> While these businesses have historically provided Rayonier with balance and financial strength, the company has evolved into two distinct businesses and investment opportunities. Accordingly, through this separation, each business will gain the flexibility to pursue its own growth strategies and operating priorities, and develop the optimal capital structure and allocation to generate long-term growth and value for shareholders.[7]

19. Analysts were skeptical. On January 28, 2014, Buckingham issued a research report entitled "Rayonier to Spin Performance Fibers – There May Be Less Here Than Meets the Eye." Buckingham observed that "[t]he company is positioning the plan as an offensive move to unlock value – but we wonder if there is more defense here than meets the eye." In addition, significant negatives included "increased corporate expense and likely higher borrowing costs at Performance Fibers." These negatives were compounded by the "unspoken motivator [of] heightened uncertainty on the trajectory of earnings from Performance Fibers given price pressure (very impactful 2014 and possibly an issue in 2015 too) as well as the ever present questions about the long-term demand in its biggest end-use, cigarettes."

**2. Boynton And His Cohorts Jump Ship To RYAM At The Last Minute To Save Themselves**

20. Despite significant concerns over market softness, decreasing demand and falling prices, Boynton pushed through with the spinoff. As part of the spinoff, Boynton and certain members of Rayonier's senior management would "resign" their positions at Rayonier to jump ship to RYAM:

> (a) Boynton agreed to "resign" his position as Chairman and CEO of Rayonier to become Chairman and CEO of RYAM. RYAM touted that Boynton was "uniquely well suited" to this position specifically due to his "previous service as Senior Vice President, Performance Fibers and Senior Vice President, Performance Fibers and

[7] *Id.*

Wood Products" positions at Rayonier and his engineering background, both of which purportedly allowed him to "develop[] valuable business, management and leadership experience, as well as extensive knowledge" of RYAM.[8] Boynton assumed his new position at RYAM on June 27, 2014, while his transfer bonus of $1,650,000, matured in December 2014.

(b) Jack Kriesel, who joined Rayonier in 1978 and followed in Boynton's footsteps to become Senior Vice President, Performance Fibers in 2009, agreed to join RYAM as the Senior Vice President of Advanced Materials. Of note, Kriesel had formerly been a process engineer at Rayonier's Port Angeles operations site. Kriesel announced his early retirement on December 31, 2014, staying on with RYAM just long enough to reap his $580,000 transaction bonus.

(c) Woo, who joined Rayonier on June 9, 2014 as Chief Accounting Officer, agreed to become RYAM's new CFO.

(d) Ruperto, who joined Rayonier in March 2014, agreed to become RYAM's Senior Vice President, Corporate Development and Strategic Planning.

(e) Michael Herman, who joined Rayonier in 2003, agreed to become RYAM's Senior Vice President, General Counsel and Corporate Secretary. He was due a $600,000 transaction bonus for the spinoff.

(f) James Posze, Jr. and Charles Hood, who worked at Rayonier in human resources and public affairs, respectively, agreed to join RYAM in those capacities. Hood received a $375,000 transaction bonus.

21. The mass exodus of executives from Rayonier to RYAM did not go unnoticed by the market. At the time, however, analysts described those who jumped ship as "experienced managers" and counted their presence as a positive for the RYAM.[9] Indeed, RYAM boasted that these executives had "an extensive background in the performance fibers business" and "possess deep knowledge of, and extensive experience in" the industry,[10] which would make their jump to RYAM appear to be a benefit for the Company.

[8] June 18, 2014 Form 8-K at Ex. 99.1 (the "Information Statement") at 83.

[9] *Seeking Alpha*, "Rayonier Advanced Materials IS A Bargain Spin-Off," (Sept. 15, 2014).

[10] June 18, 2014 Form 8-K at Ex. 99.2 at 6.

22. The real reasons for their departure from Rayonier, however, soon became known: given the troubling information looming on the horizon, Boynton would not have survived at Rayonier through the end of the year. On November 10, 2014, just months after the spinoff was complete, Rayonier announced that the company's new management (who took over after Boynton's departure)[11] "quickly identified issues" after the spinoff that required Rayonier to restate its financial results for the first and second quarters of 2014, explaining that its "previously filed financial statements . . . should no longer be relied upon."[12] The restatement was based, in part, on the fact that Rayonier overharvested its timberlands for nearly a decade, and overstated its merchantable timber inventory by 10%, which in turn impacted the Company's income and earnings.[13]

23. Despite their hasty departures, analysts immediately held Boynton and his management team responsible. On November 10, the same day as Rayonier's announcement, Morningstar reported that "[t]he November disclosure of overharvesting in the Pacific Northwest reflects poorly on prior management." Morningstar concluded in no uncertain terms that "[r]evelations that Rayonier had been overharvesting in the Pacific Northwest during [Defendant] CEO Paul Boynton's time at the helm without the knowledge of the board calls into question his oversight abilities and transparency."

---

[11] Rayonier's new management included CEO David Nunes, a 30-year veteran of the timber industry. Nunes was an outside hire; prior to Rayonier he was the President and CEO of Pope Resources since 2002. Nunes joined Rayonier on June 9 as chief operating officer, and assumed the CEO position when Boynton jumped ship to RYAM.

[12] November 10, 2014 Rayonier Form 8-K at Ex.99.1 at 6.

[13] November 10, 2014 Rayonier Form 10-Q at 47; merchantable timber are trees that have commercial value.

24. In a rare move, Rayonier itself sought to hold Boynton and his team liable. Rayonier's new management introduced an "extensive" "Clawback Policy," through which the Company might recover previously awarded incentive awards, either paid or outstanding.[14] The Clawback Policy "applies to Section 16 Officers," such as Boynton, and allows Rayonier "to recover the difference between the incentive-based awards paid and the value that would have been paid had the relevant information been known at the time the award was paid."

25. The writing on the wall was clear: rather than face the ignominy of possibly being forced out of Rayonier as a result of the company's restatement, Boynton would take his risks at RYAM amid economic uncertainty and weaknesses in the business. A July 30, 2014 Morningstar report entitled "Rayonier Benefits From High Customer Switching Costs and Recession Resistance" ominously observed that RYAM's "[d]ay-to-day operations are largely unchanged" from those at Rayonier.

**B. Rayonier Pawns Off Its Liabilities On RYAM – Both Known And Unknown**

**1. Rayonier Leaves RYAM Massively Leveraged And Saddled With Debt**

26. In order to effectuate the spinoff, Rayonier forced RYAM to take an immediate hit to its books by incurring $950 million of debt. RYAM itself described the debt it was taking on as a "significant amount" that "require[ed] a substantial portion of [its] cash flow from operations to make interest payments," which would in turn "***mak[e] it more difficult to satisfy . . . other obligations***" and "***limit[] [its] flexibility in planning for, or reacting to, changes in its business*** and the industry."[15]

---

[14] Rayonier Form DEF-14A at 31, (March 30, 2015).

[15] Information Statement at 29.

27. According to RYAM's 2014 Form 10-K, this debt consisted of $325 million of term loans, $75 million of borrowings under a revolving credit facility, and $550 million of 5.5% senior notes due 2024. Rayonier issued these senior notes on May 22, 2014 – less than a week before the spinoff was finalized.[16]

28. RYAM was required to pay $906 million to Rayonier. The end result was a highly leveraged company, with just $66 million in cash and cash equivalents at the end of 2014, and a debt to capital ratio of 107%.[17] Analysts were decidedly pessimistic, especially in light of RYAM's declining prospects. One analyst described the structure of the spinoff as "[a]dding insult to injury":

> Adding insult to injury was the structure of the spin-off, whereby Rayonier added ~$930mm of net debt via a special dividend out to the parent at the time of the spin - ***thereby leaving RYAM precariously levered even as the market environment weakened considerably***. As of 2Q FY15, most all of this debt ($830mm net) remains outstanding.[18]

29. Similarly, on June 29, 2014, the day before RYAM began trading as an independent company, Vertical Research Partners observed:

> Not a Cushy Start Now - ***We believe a year ago that RYAM would have begun life with a bit less debt*** ($950 million currently) and perhaps a stronger negotiating position before the sharp (7%-8%) price concessions it made at year-end 2013. ***We believe the board would have more evenly split the net debt among the 2 component companies a year ago***. . . . In any event, we see RYAM with its work cut out for it. ***The company needs to focus on debt reduction*** . . . .[19]

---

[16] 2014 Form 10-K at F-13.

[17] 2014 Form 10-K at 22.

[18] *Seeking Alpha*, "Rayonier Advanced Materials: 50% Cheaper In One Day, But Look Before You Leap" (Aug. 20, 2015).

[19] *Vertical Research Partners*, "Rayonier Advanced Materials – Better Late Than Never," (June 29, 2014).

30. Indeed, *Seeking Alpha* would later explain that "RYAM effectively paid to own itself by offering its parent a greater than $900 million dividend that loaded the newly-listed company with no equity and a large debt burden."[20] Even analysts who were bullish on RYAM's prospects were forced to acknowledge that "[m]any Rayonier AM investors have become leery of Rayonier AM because the newly spun company is loaded with debt."[21] Further, Boynton and Woo acknowledged that RYAM was saddled with extreme debt. Boynton acknowledged that the Company's significantly higher than the debt of peer companies, telling investors in his prepared remarks on the 2Q 2014 earnings call that RYAM "will reduce our debt leverage to a level more in line with specialty chemical companies." On the same earnings call, Woo similarly told investors that RYAM was attempting to "get our leverage down to more comfortable levels."

31. In addition to shouldering this crippling debt burden, RYAM was left hamstrung in its ability to pay off the debt – or to increase its environmental reserves – due to management's capital allocation strategy. Despite the general industry consensus that demand for Performance Fiber's (and later, RYAM's) specialty cellulose products would remain flat at best, Rayonier spent $385 million from 2011 to 2013 to convert its Jesup, Georgia plant from producing commodity pulp product to specialty cellulose product.[22] At the time, *The Motley Fool* noted that:

---

[20] *Seeking Alpha*, "Rayonier Advanced Materials: High Quality That Never Was; Reviewing A Painful Mistake," (Aug. 20, 2015).

[21] *Seeking Alpha*, "Rayonier Advanced Materials: It Should Not Take A Genius To Run This Business," (Dec. 15, 2014).

[22] 2013 Rayonier Form 10-K at 4. RYAM's specialty cellulose products were supposed to enjoy better margins and be more profitable than commodity cellulose products.

> [T]he bottom has dropped out of viscose market prices and created overcapacity across both cellulose markets (viscose and high performance). In Q3, the company cut sales projections from the added capacity by more than half.
>
> * * *
>
> Rather than placing an additional 90,000 tons into the market they are now scaling back expectations to 25,000-40,000 tons in 2014. The expansion was planned to increase production by an additional 190,000 tons per year and it looks like it may be 3-4 years now until they reach capacity. ***In the meantime the overhaul of the plant is an expense that can't be fully offset for years and they lose the income from absorbent product that was discontinued when the facility was converted to 100% cellulose***. ***The cost was around $390 million***.
>
> * * *
>
> Suddenly there is little pricing power in cellulose as the market is becoming flooded and will continue to be saturated with excess capacity and product into 2014. It couldn't have come at a worse time. ***Rayonier has made an expensive commitment to the cellulose industry and has narrowed their business even further by cutting absorbent fiber capacity and replacing it with viscose and cellulose. That left them with unanticipated unusable expansion that probably won't be fully utilized for several years delaying returns on the capital*** spent in expanding capacity.[23]

32. Looking back, Morningstar noted that "[d]espite modest demand growth, Rayonier commenced a big project to convert its commodity grade production to CS . . . This project now looks like a waste of capital . . . ."[24] Similarly, *Seeking Alpha* would later observe:

> ***It seems management misunderstands the business dynamics***. . . . None of the company's markets are high growth. When looking at estimates one year back, it seems consensus estimates were for ethers to grow 4/5%, other cellulose around 2/3%, and there was much debate whether acetate would be able to achieve even 1% growth. This would have taken years for its excess capacity to be absorbed.
>
> If we are more positive towards management, we could suggest they initiated the increased capacity as a strategic decision to scare away strengthening competitors such as Sateri [now Bracell] - but considering the latter is the low-cost operator this action would be meaningless. ***In either case it is a terrible mistake and a***

[23] *The Motley Fool*, "A Quick Trip To The Woodshed," (Nov. 2, 2013).

[24] *Morningstar*, "Rayonier's Contract Dispute With Eastman Raises Volume and Pricing Uncertainty," (Aug. 19, 2015).

***terrible waste of shareholder funds. Losses of this scale would put any CEO's position in question***.[25]

**2. RYAM Is Left Liable For Environmental Remediation Costs**

33. In addition to the massive debt that RYAM was forced to incur, Rayonier also saddled RYAM with a purported $73.8 million worth of environmental liabilities that related to 17 sites at which Rayonier maintained operations. These environmental liabilities, which were calculated pursuant to GAAP (as explained in Section V.A), were accounted for as non-current liabilities for disposed operations on RYAM's balance sheet.[26]

34. RYAM explained that these environmental liabilities relate "to prior disposed operations" and "are established to assess, remediate and monitor sites related to disposed operations from which no current or future benefit is discernible."[27] In other words, environmental liabilities are liabilities that are established to cover the costs that RYAM management believes would be incurred in the future due to its obligation to remediate pollution at Rayonier's old and abandoned operations sites.

35. Environmental liabilities are highly significant to both investors and company executives. Independent outside auditor PwC noted in May 2014 that, since the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.* and the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA," a/k/a "Superfund"), 42 U.S.C. § 9601, *et seq.* were enacted into law, the SEC has been "paying attention to companies' disclosures" and has "vigilantly monitored compliance" with the

---

[25] *Seeking Alpha*, "Rayonier Advanced Materials: High Quality That Never Was; Reviewing A Painful Mistake," (Aug. 20, 2015).

[26] Rayonier accounted for its environmental reserves under the similar title of liabilities for dispositions and discontinued operations.

[27] Information Statement at 51, 52.

established accounting guidance for environmental liabilities.[28] PwC further warned public companies that "[i]f considering . . . spinoffs, be aware of both the reporting complexity and impacts to deal value from environmental obligations."[29]

36. Given the great importance of environmental reserves to RYAM's operations, it is unsurprising that not only did RYAM closely monitor its own environmental reserves, but that it engaged specialized consultants to do so as well. RYAM promised investors that "[m]anagement periodically reviews its environmental liabilities and also engages third-party consultants to assess its ongoing remediation of contaminated sites."[30] Prior to the spinoff, Rayonier similarly assured investors that "[w]e periodically review our environmental liabilities and also engage third-party consultants to assess our ongoing remediation of contaminated sites."[31] Importantly, RYAM informed investors that, in part because these reserves were so closely monitored, they "***do not vary significantly on a quarter-to-quarter basis***."[32] Investors had no reason to doubt RYAM's repeated promises; since at least 2002, environmental reserves had decreased every year, having been cut in more than half:

[28] PwC, "Evaluating Environmental Liabilities and their Impacts on Future Earnings," at 1, 2 (May 2014).

[29] *Id*.at 1.

[30] Information Statement at 52.

[31] Rayonier made this statement, or statements substantially similar to it, in its 2001 Form 10-K at 24; 2002 Form 10-K at 20; 2003 Form 10-K at 18; 2004 Form 10-K at 18; 2005 Form 10-K at 23; 2006 Form 10-K at 24; 2007 Form 10-K at 24; 2008 Form 10-K at 26; 2009 Form 10-K at 24; 2010 Form 10-K at 23; 2011 Form 10-K at 23; 2012 Form 10-K 23; and 2013 Form 10-K at 27.

[32] Information Statement at 52.




37. The environmental liabilities decreased every year because every year, Rayonier or RYAM spent money remediating its former sites. This means that Rayonier and RYAM considered their environmental liabilities to be decreasing as time went on. Importantly, the reverse was also true: since the reserves were not increased since 2002, then no new information had emerged in over a decade that would result in increased remediation costs.

### 3. Rayonier's Demonstrated History Of Pollution Results In Extensive Environmental Liabilities That Were Known To Senior Executives

38. Under various federal and state laws, Rayonier and RYAM were obligated to remediate pollution at former operations sites. In the Information Statement and other periodic regulatory filings, RYAM disclosed five former sites that were the costliest for the Company to cleanup: Augusta, Georgia; Spartanburg, South Carolina; East Point, Georgia; Baldwin, Florida;

and Port Angeles, Washington.[33] Rayonier similarly disclosed these former operations sites in its Forms 10-K going back to at least 2010.[34] RYAM would later disclose in January 2015 that its Port Angeles site contributed the largest increase to the overall environmental liability.

39. Rayonier and RYAM were not wide-eyed newcomers to the cleanup and remediation of polluted operations sites. Far from it, RYAM had a nearly half-century long history of knowing the destruction it has wreaked upon the environment, the steps needed to remediate the pollution it caused, and the necessary costs of the required remediation measures.

### i. Rayonier Fails To Comply With Its Remediation Obligations Under Federal Law

40. Rayonier has a demonstrated history of improperly reserving for its environmental liabilities. Of the five sites that Rayonier and RYAM listed as the costliest in their regulatory filings, four (Augusta, Georgia; Spartanburg, South Carolina; East Point, Georgia; and Baldwin, Florida) were operated by Southern Wood Piedmont Co. ("SWP" and together, the "SWP Sites"), a wholly owned subsidiary of Rayonier that ceased operations (except for environmental investigation and remediation activities) in 1989. RYAM became liable for the remediation costs of these sites pursuant to the spinoff.

41. Since at least the mid-2000s, each SWP Site fell under a hazardous waste permit pursuant to RCRA. RCRA sets forth a host of obligations that companies (including Rayonier and RYAM) must follow while remediating polluted sites. One of the most significant is that RCRA requires companies to provide financial assurance to cover future remediation costs.

---

[33] Information Statement at 52-53.

[34] Rayonier made this statement, or statements substantially similar to it, in its 2010 Form 10-K at F-26; 2011 Form 10-K at F-27; 2012 Form 10-K at F-28; and 2013 Form 10-K at F-37.

42. RCRA required Rayonier to provide financial assurance for closure obligations, post closure obligations, and corrective action at its Augusta, East Point, Baldwin, and Spartanburg sites.[35] The requirements mandating the form, manner and substance of the financial assurance are extraordinarily strict, requiring, among other things, maintenance of specific financial ratios, maintenance of absolute minimum values for certain financial metrics, and certain minimum ratings for recent bond issuances.[36] The CFO of the company providing the assurance (in this case, Rayonier) must certify that these requirements have been met, in writing, to the EPA.[37]

43. Purportedly pursuant to RCRA, SWP obtained financial assurance for these sites from Rayonier.[38] On June 16, 2009, the EPA sent an information request to Rayonier to determine if it and SWP were in compliance with RCRA's financial assurance provisions. Rayonier's response to this information request resulted in the company, through SWP, receiving a Notice of Violation on February 4, 2010 (the "2010 Notice of Violation"). The 2010 Notice listed three separate violations of RCRA that spanned half a decade:[39]

(a) Despite RCRA requiring Rayonier to maintain a bond issuance that was rated at least BBB (by S&P) or Baa (by Moody's), and for its CFO to certify the same, Rayonier and its CFO did not do so for the years 2004 through 2009.[40] For the years 2004 through 2006, instead of relying on a bond issuance, Rayonier and its CFO instead relied on a revolving credit facility that was issued on November 24, 2003 and matured

---

[35] Rayonier provided these assurances under 40 C.F.R. §§ 264.142; 264.144; and 264.101(b).

[36] 40 C.F.R. §§ 264.143(f); 264.145(f).

[37] 40 C.F.R. §§ 264.143(f)(10); 264.145(f)(10).

[38] NOV at 2.

[39] In addition to the four sites disclosed, the NOV also applied to sites in Waverly, Ohio, and Chattanooga, Tennessee.

[40] NOV at 3-4.

on November 23, 2006. For the years 2007 through 2009, instead of relying on a bond issuance, Rayonier and its CFO instead relied on a revolving credit facility that was issued on August 6, 2006 and matured on August 4, 2011. Neither of these credit facilities was rated by Moody's or S&P.

(b) Evincing knowledge of its wrongful acts, Rayonier's certifications to the EPA relating to the required minimum bond ratings for the years 2004 through 2009 did not track the statutorily mandated language.[41] Instead, Rayonier deliberately changed the phrase "bond rating" to "public debt rating" and "bond" to "debt facility." Nevertheless, Rayonier's CFO falsely certified that the wording of the company's assurances was identical to the wording specified in the regulations.

(c) For the years 2004 through 2009, Rayonier illegally added language to the assurance allowing it to cancel the guarantee with respect to the Spartanburg site.[42] Again evincing knowledge, Rayonier falsely certified that the language of the company's assurances was identical to the language specified in the regulations.

44. As a result of the 2010 Notice, on December 7, 2011, Rayonier and the EPA entered into a Consent Agreement (the "EPA Consent Agreement"). The EPA Consent Agreement concluded that:

> EPA has determined that because Respondent Southern Wood Piedmont, during the Relevant Time Period [2005 through 2009], relied on the guarantees described . . . . ***Respondent Southern Wood Piedmont did not have compliant financial assurance during the Relevant Time Period at the five (5) [sites] subject to this Agreement, as the guarantees failed to meet the requirements of [applicable law]***. Respondent Southern Wood Piedmont's failure to comply with the financial assurance requirements for closure at one if its [sites]; for post-closure at five of its [sites]; and for correction action at three of its [sites], constitutes violations of RCRA . . . .[43]

45. The EPA Consent Agreement resulted in a civil penalty of $317,000, and further required Rayonier to obtain more than $41.7 million in complying financial assurance.[44]

---

[41] NOV at 4-5.

[42] NOV at 5-6.

[43] EPA Consent Agreement ¶68.

[44] *Id.*

Notably, Michael Herman signed on behalf of Rayonier. Upon the spinoff, Herman was appointed RYAM's Senior Vice President, General Counsel and Corporate Secretary.

46. The 2010 Notice of Violation and the EPA Consent Agreement definitively prove that, since at least 2004, Rayonier has been violating federal law with respect to financially assuring its remediation obligations.

**ii. Rayonier Knowingly Understates Its Liabilities At Its Port Angeles, Washington Site**

47. Rayonier operated a paper and pulp mill in Port Angeles, Washington from 1930 to 1997. The Port Angeles site consists of approximately 75 acres along the shoreline of the Strait of Juan de Fuca, a waterway that leads to the Puget Sound. From 1930 to 1972, Rayonier's Port Angeles operation spewed wastewater into surrounding waters, which contained many poisonous pollutants including oil, dioxin, lead, and arsenic. According to data compiled by the EPA from 1992-1996, the Port Angeles operations site was the largest single source of toxic chemicals to surface waters in the state of Washington.[45]

48. As early as March 1967, the U.S. Department of the Interior published a study entitled "Pollutional Effects of Pulp and Paper Mill Wastes in Puget Sound" which found that Rayonier's Port Angeles operations site was "a significant waste source."[46] As a result, the report recommended that Rayonier undertake a costly four-step cleanup process.[47]

---

[45] This data was compiled from Compiled from the U.S. EPA, Toxics Release Inventory 1992-1996. *See* Richard Puchalsky and Allison LaPlante, "Troubled Waters, A Report on Toxic Releases into America's Waterways," p.39, Grassroots Connection and U.S. Public Interest Research Group, 1998.

[46] United States Department of the Interior, "Pollutional Effects of Pulp and Paper Mill Wastes in Puget Sound," March, 1967, Federal Water Pollution Control Administration. This report predates the establishment of the U.S. Environmental Protection Agency.

[47] *Id*. at 35.

49. After Rayonier shuttered the Port Angeles operations in 1997, the EPA set up a large inspection and study of the site, which included taking nearly 300 soil and water samples. In 1999, as a result of the extensive pollution it found, the EPA declared that the site was eligible for Superfund listing. Due to Rayonier's extensive lobbying efforts, in May 2000 the EPA agreed to cede jurisdiction for the remediation to state authorities, which required Rayonier to establish a cleanup plan.

50. On July 30, 2002, the Washington Department of Ecology entered into Agreed Order No. DE 02SWFAPSR-4570 with Rayonier (the "2002 Agreed Order"). The 2002 Agreed Order required the company to "evaluate the nature and extent of any chemical of concern" in the marine environment surrounding the Port Angeles site "so that an assessment of the current and future risks to human health and the environment can be determined."[48] The Department of Ecology determined that these reports made "significant progress towards understanding the nature and extent of contamination at the [Port Angeles] Site . . . ."[49]

51. Pursuant to the 2002 Agreed Order, Rayonier submitted three reports to the Washington Department of Ecology: "Ecological Risk Assessment For The Marine Environment Near The Former Rayonier Mill Site, Port Angeles, Washington," in March 2006; "Remedial Investigation for the Marine Environment Near the Former Rayonier Mill Site, Port Angeles, Washington," in February 2007; and "Phase 2 Addendum Remedial Investigation for the Marine Environment Near the Former Rayonier Mill Site, Port Angeles, Washington," in February 2007.

52. On March 11, 2004, the Department of Ecology and Rayonier entered into Agreed Order No. DE 04SWFAPSR-6025 (the "2004 Agreed Order"). Under the 2004 Agreed Order,

[48] 2010 Agreed Order at 7.

[49] 2010 Agreed Order at 7.

Rayonier "agreed to conduct the Remedial Investigation and Feasibility Study (RI/FS) activities described in" a three-volume, March 2004 management plan.[50] Notably, RYAM would later claim that it was never required to conduct a feasibility study on the Port Angeles site prior to 2014. *See* Section IV. The purpose of the management plan was "to evaluate the nature and extent of any chemicals of concern" in the Port Angeles upland [i.e., non-marine] area "so that an assessment of the current and future risks to human health and the environment they pose can be determined."[51]

53. Pursuant to the 2004 Agreed Order, Rayonier submitted two reports to the Department of Ecology: "Remedial Investigation for the Uplands Environment of the Former Rayonier Mill Site, Port Angeles, Washington," in March 2007; and "Terrestrial Ecological Evaluation for the Uplands Environment at the Former Rayonier Mill Site, Port Angeles, Washington," also in March 2007. The Department of Ecology determined that these reports made "significant progress towards understanding the nature and extent of contamination at the [Port Angeles] Site . . . ."[52] Rayonier, however, never submitted the feasibility study, as the 2004 Agreed Order requires.

54. As a result of the studies that Rayonier completed under the 2002 and 2004 Agreed Orders, the Department of Ecology named Rayonier as a Potentially Liable Person ("PLP") for the Port Angeles site on March 16, 2009. Under Washington law, identification of a

---

[50] According to the Department of Ecology, a remedial investigation/feasibility study is "an in-depth study conducted to "[d]etermine detailed site characteristics and define the extent and magnitude of contamination at a site; Evaluate potential impacts on human health & the environment and establish cleanup criteria; and Evaluate cleanup alternatives." *Understanding Site Cleanup, available at* http://www.ecy.wa.gov/programs/tcp/cu_support/cu_process__steps_defns.htm.

[51] 2010 Agreed Order at 8.

[52] 2010 Agreed Order at 9.

PLP "is necessary to . . . recover the costs and damages associated with the investigation and cleanup of [hazardous waste] sites."[53]

55. On January 19, 2010, the Department of Ecology and Rayonier signed[54] Agreed Order No. DE 6815 (the "2010 Agreed Order"). The 2010 Agreed Order explicitly binds all of Rayonier's successors and assigns, and required interim remedial action on the part of Rayonier. The Department of Ecology explained that:

> ***[A]n interim action is a remedial action*** that is technically necessary to reduce a threat to human health or the environment by eliminating or substantially reducing one or more pathways for exposure to a hazardous substance, ***that corrects a problem that may become substantially worse or cost substantially more to address if the remedial action is delayed***, or that is needed to provide for completion of a site hazard assessment, RI/FS, or design of a cleanup action. ***The interim action contemplated in this Order will expedite cleanup*** and reduce threats to human health and the environment. ***Cleanup of the Study Area promotes re-use of a portion of the Site in an area where both Parties agree to expedite work without waiting for the full nature and extent of contamination to be defined***. In the context of this Site, these circumstances warrant an interim action . . . .[55]

56. The 2010 Agreed Order dictated in minute detail what actions Rayonier was required to take and how it required to perform them. Rayonier was required to "fully define the nature and extent of contamination in the [former operations site], evaluate interim action alternatives for the [former operations site], and draft an Interim Action Plan for the [former

[53] Policy 500B: Identification of Potentially Liable Persons, *available at* http://www.ecy.wa.gov/programs/tcp/policies/pol500b.pdf.

[54] At the time, Michael Herman signed on behalf of Rayonier. Upon the spinoff Herman was appointed RYAM's Senior Vice President, General Counsel and Corporate Secretary.

[55] 2010 Agreed Order at 13.

operations site].” To do so, Rayonier was required to produce four separate volumes of an Interim Action Report, as well as monthly progress reports.[56]

57. Each volume of the Interim Action Report had a specific purpose. Relevant here, the purpose of Volume III was to “develop and evaluate remedial alternatives for the Study Area, including both the upland and marine environments, which will enable interim actions to be selected for the upland and marine portions” of the Port Angeles site.[57] Importantly, the Department of Ecology required that in Volume III, Rayonier’s “detailed evaluation of the interim action alternatives” for the site must meet the requirements of Washington Annotated Code 173-340-360.

58. WAC 173-340-360, entitled “Selection of cleanup actions,” “describes the minimum requirements and procedures for selecting cleanup actions.”[58] “When selecting from cleanup action alternatives,” companies are required to “[u]se permanent solutions to the maximum extent practicable,”[59] and “[w]hen selecting a cleanup action, preference shall be

[56] The monthly progress reports were required to contain eight separate pieces of information, including (1) a description of the actions which have been taken to comply with the Agreed Order; (2) Summaries of sampling and testing reports and all other data reports received by Rayonier; (3) Summaries of deviations from approved work plans and an explanation of Rayonier’s position on whether the deviations constitute minor or substantial changes to the work to be performed, in accordance with Section VIII.L (Amendment of Order); (4) Summaries of contacts with representatives of the local community, public interest groups, press, and federal, state, or tribal governments related to the Site cleanup; (5) Summaries of problems or anticipated problems in meeting the schedule or objectives set forth in the Work To Be Performed and Work Plan; (6) Summaries of solutions developed and implemented or planned to address any actual or anticipated problems or delays; (7) Changes in key personnel; and (8) A description of work planned for the next reporting period. 2010 Agreed Order at 14-15.

[57] 2010 Consent Order at 24.

[58] WAC 173-340-360(1).

[59] WAC 173-340-360(2)(b)(i).

given to permanent solutions to the maximum extent practicable."[60] Importantly, in determining the permanency of a cleanup solution, a disproportionate cost analysis "shall be used. The analysis shall compare the costs and benefits of the cleanup action alternatives. . . ."[61] Costs include:

> The cost to implement the alternative, including the cost of construction, the net present value of any long-term costs, and agency oversight costs that are cost recoverable. Long-term costs include operation and maintenance costs, monitoring costs, equipment replacement costs, and the cost of maintaining institutional controls. Cost estimates for treatment technologies shall describe pretreatment, analytical, labor, and waste management costs. The design life of the cleanup action shall be estimated and the cost of replacement or repair of major elements shall be included in the cost estimate.[62]

59. Accordingly, Rayonier has known since at least January 2010 that it would be required to undertake significant remediation costs at its Port Angeles site. Yet the environmental liability attributable to the site did not materially change until December 2014:




[60] WAC 173-340-360(3)(b).

[61] WAC 173-340-360(3)(b).

[62] WAC 173-340-360 (3)(f)(iii).

60. On June 30, 2014 – the date that RYAM first began trading as an independent company – Rayonier submitted to the Department of Ecology a "Draft Development of Interim Action Alternatives," which constituted a section of Volume III. Notably, this report was initially due in 2012, yet Rayonier asked for and was granted an extension until June 2013, then January 2014, and finally, until June 30, 2014; it was not until after the RYAM spinoff was complete that Rayonier finally – and suspiciously – submitted the report.[63] This report required Rayonier to "identify the range of potentially applicable cleanup technologies for remediation of soils, groundwater, surface water, and sediment" and "screen the cleanup technologies for technical implementability, and develop a range of alternatives for detailed evaluation."[64] Rayonier did so, listing five different remediation scenarios each for sediment, and soil contamination and two different remediation scenarios for groundwater contamination.

61. Then, on February 27, 2015, Rayonier released the completed Agency Review Draft of Volume III. This Agency Review Draft is the "feasibility study" to which RYAM referred to in its January 28, 2015 Press Release, when it was discovered that "the remediation plan had to be revised and expanded, meaningfully increasing the estimated costs for the project." With one exception, ***every remedial action in the February 27, 2015 report also appeared in the June 30, 2014 report***. Despite the fact that Rayonier knew of the costs in June 2014 due to the requirements of WAC 173-340-360, it did not list the anticipated costs of each alternative in the June 2014 report:

---

[63] Ostensibly, this was so that Rayonier could better study restoration. *See* http://www.ecy.wa.gov/programs/tcp/sites_brochure/rayonier/AO-Timeline-2014.html.

[64] 2010 Agreed Order at 27.

| Scenario | Description | Included in June 2014 Report | Included in February 2015 Report | Estimated Cost in February 2015 Report |
|---|---|---|---|---|
| *Sediment Scenarios* | | | | |
| S-1 | Capping and Dredging of 50,000 CY total | Yes | Yes | $7,098,000 |
| S-2 | Upgraded cap and Dredging of 72,000 CY total | Yes | Yes | $11,142,000 |
| S-3 | Additional Capping and Dredging of 125,000 CY total | Yes | Yes | $18,078,000 |
| S-4 | Limited capping and Dredging of 209,000 CY total | Yes | Yes | $26,270,000 |
| S-5 | Limited capping and Dredging of 270,000 CY total | Yes | Yes | $33,351,000 |
| *Soil Scenarios* | | | | |
| SL-1 | Capping of West Mill, Ennis Creek, East Mill | Yes | Yes | $1,970,000 |
| SL-2 | Capping of West Mill, Ennis Creek, East Mill, and City Purchase Area | Yes | Yes | $2,214,000 |
| SL-3 | Upgraded Capping of West Mill, Ennis Creek, East Mill, and City Purchase Area | Yes | Yes | $2,699,000 |
| SL-4 | Capping of West Mill, Ennis Creek, East Mill, and City Purchase Area and Hot Spot Excavation (16,000 Tons) | Yes | Yes | $5,331,000 |
| SL-5 | Capping of West Mill, Ennis Creek, East Mill, and City Purchase Area and Hot Spot Excavation (19,000 Tons) | Yes | Yes | $6,126,000 |
| *Groundwater Scenarios* | | | | |
| G-1 | Passive Treatment with Sand Filter | Yes | Yes | $5,185,000 |
| G-2 | Passive Reactive Barrier Construction | Yes | Yes | $12,528,623 |
| G-3 | ISCO-ISCF Treatment | No | Yes | $67,233,000 |

62. There was no other report submitted between June 2014 and February 2015 that would have altered Rayonier's (or RYAM's) knowledge of the Port Angeles site. In addition, RYAM's claim that the feasibility study was the "only" feasibility study it was required to perform at Port Angeles was blatantly false, as the feasibility study it was required to submit – but never did – pursuant to the 2004 Agreed Order demonstrates.

**iii. RYAM's Shareholders And Interest Groups Push For Transparency Regarding Environmental Reserves, But Are Rebuffed**

63. Not only do Rayonier and RYAM have a long and demonstrated history of trying to avoid financial obligations to remediate former operations sites, but Defendants have long

known that investors have pushed for increased transparency regarding Rayonier's (and later, RYAM's) environmental impact and costs of remediating operations sites.

64. On November 29, 2013, investor advocacy group Investor Voice called for a new resolution to be included in Rayonier's next proxy that would have required a report to shareholders "that describes how Rayonier . . . manages risks and costs related to [pollution] discharge" at its Jesup, Georgia site.[65] According to Rayonier's 2013 Form 10-K, Rayonier derived $359 million worth of operating income from Performance Fibers' operations at the Jesup site. The report would specifically include "[p]ossible long-term liabilities of river cleanup." Investor Voice noted that, in addition to the pollution cased at the site:

> A longer-term concern is what the cost will be of cleaning up the [site]. Shareholders will bear the inevitable long-term cost of cleanup, while current company managers will likely be long retired – taking their high salaries and bonuses with them.

65. Rayonier fought frantically against including this resolution in the proxy, which included submission of the No-Action Letter to the SEC filled with seven instances where the Company was called upon to reform its Jesup operations site to reduce the amount of pollution discharged into the environment. Ultimately, the SEC required Rayonier to include the resolution in its proxy on March 11, 2014, finding that "the proposal focuses primarily on the environmental impacts of Rayonier's operations . . . ."

66. The push for increased transparency has not only come from investors, but from environmental interest groups as well. On June 15, 2009, Environmental Stewardship Concepts ("ESC") presented a presentation entitled "Port Angeles Harbor: Current Status and Future Outlook."[66] The presentation first noted that preliminary results of a soil study at Rayonier's

---

[65] Letter dated November 29, 2013 from Bruce T. Herbert to W. Edwin Frazier, III.

[66] https://d10k7k7mywg42z.cloudfront.net/assets/4c6ffd11dabe9d42ee000007/oec_6.pdf.

Port Angeles site were released in February 2009.[67] The presentation then looked toward the "future at Rayonier," noting that a review and public comment period were set to take place in July and August later that year on various cleanup options Rayonier could employ to remediate the soil, ranging from leaving the contaminated soil in place to removing it entirely.[68]

67. Importantly, these were the very same options available at the Duwamish River Cleanup site (which was not operated by Rayonier), which lay just 135 miles down the coastline of the Puget Sound from Port Angeles. The Duwamish site was in a more advanced stage in the remediation process, with a feasibility study already having been made available for public comment.[69] Because of the advanced status of the Duwamish project, ESC saw significant overlap between the two sites, and noted that Rayonier could learn "[l]essons from the Duwamish."[70]

68. Two weeks after the presentation, on June 30, 2009, ESC issued a paper entitled "Clean Up Options at Rayonier Mill Site, Port Angeles Harbor, Washington."[71] In the paper, ESC identified various issues regarding remediation strategies "needing to be addressed in the Feasibility Study for the Rayonier Mill site."[72] ESC discounted the effectiveness of one proposed remediation strategy for the Port Angeles site, known as monitored natural recovery, because of the use of that strategy at the James River in Virginia in the 1970s. ESC warned that

[67] Slide 14. The soil study samples were taken pursuant to the 2004 Agreed Order.

[68] Slides 14, 16.

[69] Slide 12.

[70] Slides 12, 19.

[71] http://d10k7k7mywg42z.cloudfront.net/assets/4c6ff518dabe9d392d00002b/cleanup_options_at_rayonier_site.pdf.

[72] *Clean Up Options* at 1.

"[t]he possibility that Port Angeles could result in the same prolonged contamination [28 years] should not be surprising" given similar pollution processes.[73]

69. In the end Rayonier chose to ignore the advice of its shareholders and public interest groups. In January 2015 RYAM increased its environmental reserves after having been caught unaware that its Port Angeles site could also be subject to a feasibility study – which the Company described as "the only such study of its kind required to be submitted since the facility closed in 1996."[74]

70. Since at least the mid-2000s, Rayonier and RYAM have been doing everything possible to avoid complying with laws and regulations to ensure that they are appropriately reserved for environmental liabilities. Even after conducting multiple studies and submitting multiple reports laying out the exact same operations that would suddenly and inexplicably result in an increase to the environmental reserve years later, RYAM failed to increase its reserve until it was too late:

| ($mm) | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | Spin-Off | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Env. liabilities of disposed operations | $162.2 | $153.6 | $146.1 | $140.4 | $122.5 | $113.7 | $104.6 | $98.6 | $93.2 | $90.8 | $81.7 | $76.4 | $73.8 | $156.7 |
| *Change:* | | *-5.3%* | *-4.9%* | *-3.9%* | *-12.7%* | *-7.2%* | *-8.0%* | *-5.7%* | *-5.5%* | *-2.5%* | *-10.1%* | *-6.5%* | *-3.3%* | *112%* |

## IV. THE TRUTH IS REVEALED

71. Defendants could not keep RYAM's burgeoning environmental reserves hidden from investors forever. The first sign of trouble occurred on November 10, 2014. On that date Rayonier stunned the public when it issued a press release announcing that the company's new management (who took over after Boynton's departure) "quickly identified issues" after the spinoff that required Rayonier to restate its financial results for the first and second quarters of

[73] *Clean Up Options* at 4-5.

[74] January 28, 2015 Form 8-K at Ex. 99.1.

2014, explaining that its "previously filed financial statements . . . should no longer be relied upon," and to admit that a material weakness in the company's internal controls existed.[75]

72. On this news, RYAM's stock price declined $1.79 per share, or 6.4%, to close on November 10 at $26.18 on unusually large trading volume. RYAM's stock price continued its decline on November 11, dropping an additional $1.12 per share on unusual heavy volume to close at $25.06 per share. Over the span of these two days, RYAM's stock plummeted $2.91 per share, or 10.4%, wiping out over $76 million of market capitalization:




73. This two-day decline was statistically significant and occurred as a direct and proximate result of Rayonier's November 10, 2014 restatement.

74. Analysts immediately connected RYAM's decline to Rayonier's unexpected announcement – and directly called Boynton's credibility and leadership capabilities into question. On the very day that Rayonier announced the restatement, a Morningstar report entitled "Rayonier Reveals Overharvesting in Pacific Northwest; We Cut Our Fair Value Estimate," noted that "***Rayonier's disclosure*** of P[acific] N[orth] W[est] overharvesting ***reflects***

[75] November 10, 2014 Rayonier Form 8-K at 6.

***poorly on prior management (now at Rayonier Advanced Materials)***." That same day, *Seeking Alpha*, a widely-followed financial website, published an article entitled "Rayonier Advanced Materials hit by Rayonier restatement," noting that RYAM was "down alongside Rayonier" and cynically observed that "the management team which looks to have botched the first half doings at Rayonier is now running Rayonier Advanced Materials."[76]

75. Still trying to make sense of the mess that Boynton had left in his wake at Rayonier and what that meant for RYAM, on November 11, 2014, Morningstar published another report entitled "Changing Rayonier Advanced Materials' Stewardship Rating to Poor From Standard," which downgraded RYAM, explaining:

> We're changing our stewardship rating on Rayonier Advanced Materials to Poor from Standard. While we credit the management team with the value-accretive decision to separate Rayonier into two more-focused enterprises, Rayonier and Rayonier Advanced Materials, ***credibility and capital allocation are concerns***.
>
> ***Revelations that Rayonier had been overharvesting in the Pacific Northwest during Advanced Materials CEO Paul Boynton's time at the helm without the knowledge of the board calls into question his oversight abilities and transparency***. The 19% overstatement of Pacific Northwest merchantable inventory in the 2013 10-K, since corrected by new management, is especially concerning to the extent ***it was not the first time a management decision (or oversight) obscured what had been going on in the region***.

76. Even analysts who were bullish on RYAM's prospects questioned the Company's management. In a December 15, 2014 article entitled "Rayonier Advanced Materials: It Should Not Take A Genius To Run This Business," *Seeking Alpha* noted that "[i]nvestors are concerned because [Rayonier's] misstatement happened under now Rayonier AM's CEO Paul Boynton's watch. ***The concerns are valid*** and investors should keep an eye on future inventory reporting

---

[76] *Seeking Alpha*, "Rayonier Advanced Materials hit by Rayonier Statement," (November 10, 2014).

and pay special attention to any new legal developments."[77] Indeed, investors questioned Boynton's management of Rayonier so acutely that on RYAM's January 28, 2015 earnings call, he was compelled to defend himself against what he described as "Rayonier's comments [that] have been interpreted by some to call into question the integrity of management. . . ."

77. On November 28, 2014, the day after Thanksgiving, RYAM hastily announced the sudden and unexpected resignation of CFO Woo, who had only started at Rayonier just three weeks prior to the spinoff. Ruperto was named as RYAM's new CFO, effective immediately. RYAM touted in its press release that Ruperto's promotion "better integrates our accounting and planning functions," maintaining that it had merely "consolidated its senior management position of chief financial officer with corporate development and strategic planning" in order to "become more efficient" and "reduc[e] management costs."[78]

78. Analysts, however, were still puzzled by Woo's mysterious departure. In a December 4, 2014 report entitled "Rayonier Advanced Materials Finds Efficiencies and Savings in a Surprising place," Morningstar noted:

> Management indicated publicly that the consolidation of management positions carries two benefits: integration of accounting and planning functions plus cost reductions. The company had mentioned on its third quarter earnings call that it would be looking for efficiencies and cost saving opportunities wherever it could find them.
>
> ***We found the move surprising for a couple of reasons. First, companies in search of cost savings don't often send their CFO packing. After all, the CFO is typically the one seeking out savings opportunities***. Surely prospective operational savings for a company with a $1 billion top line would dwarf savings to be had from shedding Woo's compensation. ***Second, we would have thought the board would deem a separate CFO role especially important following***

[77] *Seeking Alpha*, "Rayonier Advanced Materials: It Should Not Take A Genius To Run This Business," (December 15, 2014).

[78] November 28, 2014 Form 8-K at Ex. 99.1.

> ***recent disclosure of accounting issues at Rayonier, if only to install confidence among shareholders.***
>
> ***This leads us to believe that the motivation for the move extends beyond "efficiencies" and "cost savings."*** Assuming Woo was asked to leave (we can't know for sure and the Securities and Exchange Commission filing indicates he resigned), it seems likely his fit for the role might not have been as strong as anticipated. Rather than undertake a time-consuming CFO search, the board was inclined to tap an internal candidate. As it happened, the board found one in Ruperto, a logical choice, as he had already been assuming an active role in budgeting and finance.

79. Similarly, in a December 15 article entitled "Rayonier Advanced Materials: It Should Not Take A Genius To Run This Business," *Seeking Alpha* warned that "the resignation of Mr. Woo and the disclosure of [Rayonier's] inventory overstatement may raise some red flags for investors . . . ."[79]

80. On January 28, 2015, the full extent of the Defendants' fraudulent conduct was revealed. Investors were shocked when RYAM revealed in a press release that its environmental reserves were massively understated:

> ***In the fourth quarter of 2014, the Company's environmental reserves for the assessment, remediation and long-term monitoring and maintenance of its disposed operations were increased by $69 million, and the related property values were reduced by $7 million***. This reflects an increase to the Company's estimates of required spending over the next 20 years for these sites.
>
> ***Nearly 80 percent of the increase is related to four sites*** for which, in the fourth quarter, remediation plans were legally required or whose previous plans changed meaningfully due to commercial and/or legal reasons. The remaining change to the reserve was spread over an additional 13 sites based upon the Company's update of estimated costs for ongoing remediation, monitoring and maintenance over the next 20 years on an undiscounted basis. To put this in perspective, the changes represent an average increase in costs of approximately $50,000 per site per year.
>
> The site of its former pulp mill in Port Angeles, WA required the largest adjustment, accounting for $33 million, or 48 percent, of the increase to the

---

[79] *Seeking Alpha*, "Rayonier Advanced Materials: It Should Not Take A Genius To Run This Business," (December 15, 2014).

> reserves. In February of 2015, the Company is required to submit a feasibility study for remediation of this site, the only such study of its kind required to be submitted since the facility closed in 1996. In preparing for submission of this study, ***it was determined that the previous preferred industrial reuse strategy was no longer viable and therefore, the remediation plan had to be revised and expanded, meaningfully increasing the estimated costs for the project***.[80]

81. On this news, RYAM's stock price plummeted $0.92 per share, or 5%, to close at $17.98 on unusually large trading volume. RYAM's stock price continued its decline on January 29, 2015, falling an additional $0.85 per share for a 2-day decline of $1.77, or 9.4%. The decline wiped out an additional $75 million in RYAM's market capitalization:




82. The two-day decline was statistically significant and occurred as a direct and proximate result of RYAM's January 28, 2015 announcement.

83. The public was understandably stunned. On January 28, 2015, the *Jacksonville Business Journal* published an article entitled "Weak Demand, Environmental Costs Batter

[80] January 28, 2015 Form 8-K at Ex. 99.1.

Rayonier Advanced Materials Results," noted that RYAM was "[h]ammered by an increase in how much it needs to set aside for environmental remediation."[81]

84. Similarly, a January 29, 2015 Vertical Research Partners report observed that:

> **New Surprises** – Frankly, when Rayonier Advanced Materials spun out of Rayonier Timber REIT in mid-2014, we did not focus on the-then disclosed environmental liability of $74 million (~$1.75/share) that went with RYAM. This liability is tied to the closed (in 1996) Port Angeles, WA pulp mill plus a number of other facilities. ***The company in reporting fourth quarter results now says that it is on the hook for $157 million – an incremental ~$2/share in clean up costs. All-in, many investors are now seeing a nearly $4/share liability that was not earlier in focus. We point out that the largest site, Port Angeles, is not resolved in terms of the remediation requirement, and we could see RYAM's ultimate liability at that facility rise.*** The company's "Other Non-Current Liabilities" not tied to environmental liabilities increased in the fourth quarter to $151 million from $105 million (~$1/share). Even for the sharpest investors, the net increase in these liabilities (environmental and other long term) since September 30th is nearly $3/share.

85. The massive increase in environmental reserves was mostly attributable to Port Angeles, which saw its liability increase by ***393%*** since the spinoff. In addition, RYAM's other sites also exhibited shocking increases ranging from 66% to 141%:

| ($000) | **Liabilities Assumed at Separation** | **Expenditures** | **Increase to Liabilities** | **12/31/14 Liability** | **% Increase** |
|---|---|---|---|---|---|
| **Augusta, Georgia** | 10,838 | (691) | 12,060 | 22,207 | 105% |
| **Spartanburg, South Carolina** | 10,902 | (710) | 8,792 | 18,984 | 74% |
| **East Point, Georgia** | 9,404 | (612) | 6,805 | 15,597 | 66% |
| **Baldwin, Florida** | 10,172 | (640) | 14,996 | 24,528 | 141% |
| **Port Angeles, Washington** | **8,100** | **(1,109)** | **32,922** | **39,913** | **393%** |

[81] Jensen Werley, "Weak demand, environmental costs batter Rayonier Advanced Materials results," *Jacksonville Business Journal*, (Jan. 28, 2015).

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

86. Throughout the Class Period, Defendants made false and misleading statements regarding RYAM's environmental liabilities, RYAM's site-specific obligations, RYAM's use of accounting estimates, and Defendants' Sarbanes-Oxley certifications. Each of these false statements and omissions impacted RYAM's stock price.

### A. False Statements Regarding RYAM's Environmental Remediation Costs

87. On June 18, 2014, RYAM filed a Form 8-K, which included the Information Statement, signed by Boynton, as Exhibit 99.1. In the Information Statement, Defendants falsely assured investors that:

> SpinCo currently owns and formerly operated manufacturing facilities that it does not currently own, and may acquire additional facilities in the future, which are subject to environmental liabilities, such as remediation of soil, sediment and groundwater contamination and other existing or potential liabilities. The cost of investigation and remediation of contaminated properties could increase operating costs and adversely affect financial results. Although ***SpinCo believes it currently has adequate reserves for the investigation and remediation of its properties***, legal requirements relating to assessment and remediation of these properties continue to become more stringent and there can be no assurance that actual expenditures will not exceed expectations, or that other unknown liabilities will not be discovered in the future.[82]

88. The Information Statement was incorporated by reference as an exhibit to RYAM's June 30, 2014 Form 8-K.[83]

89. Throughout the Class Period, Defendants falsely and misleadingly understated RYAM's environmental remediation costs, which it accounted for under "non-current liabilities for disposed operations" pursuant to ASC-410-30-25. Defendants also falsely and misleadingly

---

[82] June 18, 2014 Form 8-K at Ex. 99.1 at 22. RYAM referred to itself as "SpinCo" in the Information Statement.

[83] June 30, 2014 Form 8-K at Item 9.01 (incorporating by reference June 18, 2014 Form 8-K at Ex. 99.1).

understated "reasonably possible additional losses" that could be incurred in addition to those environmental remediation costs. The false figures and corresponding reporting periods are shown in the following chart:

| **Date** | **Reported Non-Current Liabilities** | **Reported "Reasonably Possible Additional Losses"** |
|---|---|---|
| June 18, 2014 Form 8-K | $67.5 million[84] | $30 million[85] |
| June 30, 2014 Form 8-K | $67.5 million[86] | $30 million[87] |
| July 30, 2014 Form 8-K | $84.9 million[88] | N/A |
| August 5, 2014 Form 10-Q | $84.853 million[89] | $33 million[90] |
| October 29, 2014 Form 8-K | $84.2 million[91] | N/A |
| November 4, 2014 Form 10-Q | $84.193 million[92] | $33 million[93] |

[84] June 18, 2014 Form 8-K at Ex. 99.1 at 52.

[85] June 18, 2014 Form 8-K at Ex. 99.1 at 54.

[86] June 30, 2014 Form 8-K at Item 9.01 (incorporating by reference June 18, 2014 Form 8-K at Ex. 99.1 at 52).

[87] June 30, 2014 Form 8-K at Item 9.01 (incorporating by reference June 18, 2014 Form 8-K at Ex. 99.1 at 54).

[88] July 30, 2014 Form 8-K (signed by Woo) at Ex. 99.1 (Press Release).

[89] 2Q 2014 Form 10-Q (filed August 5, 2014) (signed by Woo) at 12.

[90] 2Q 2014 Form 10-Q (filed August 5, 2014) at 14.

[91] October 29, 2014 Form 8-K (signed by Woo) at Ex. 99.1 (Press Release).

[92] 3Q 2014 Form 10-Q (filed November 4, 2014) (signed by Woo) at 14.

[93] 3Q 2014 Form 10-Q (filed November 4, 2014) at 15.

90. These reported figures are materially false and misleading because:

(a) Despite three Agreed Orders with the Department of Ecology since 2002, each of which required significant investigation and analysis of the Port Angeles site and multiple reports to be submitted to the Department, and despite being found to be in violation of federal law with respect to financial assurances for its SWP Sites, RYAM's environmental reserve did not increase since 2002. Indeed, the reserve for the Port Angeles site did not appreciably increase between the time of the 2010 Agreed Order and January 2015, at which point it increased 393%.

(b) As Rayonier disclosed in its feasibility study submitted on June 30, 2014 – which was originally due to be submitted in 2012 but was pushed back due to Rayonier's extensive lobbying efforts – the detailed evaluation of remediation alternatives for the Port Angeles site provided Defendants with actual knowledge of all possible remediation scenarios that RYAM would be required to undertake, yet Defendants continued to assure investors that the current decreasing reserves were sufficient.

(c) With respect to the SWP Sites, the fact that the environmental reserve rose in unison across all sites demonstrates that Defendants did not continually monitor those sites, despite being ordered by the EPA to obtain financial assurance that complies with RCRA for them.

**B. False Statements Regarding RYAM's Site-Specific Obligations**

91. RYAM also broke out site-specific liabilities for project sites where the Company's remediation estimate exceeded 10% of the total disclosed liabilities for disposed operations. The false figures and corresponding reporting periods are shown in the following chart:

| **Remediation Site** | **Liability (as of June 28, 2014)**[94] | **Liability (as of September 27, 2014)**[95] |
|---|---|---|
| Augusta, Georgia | $18.1 million | $17.8 million |
| Spartanburg, South Carolina | $14.4 million | $15.6 million |
| East Point, Georgia | $13.7 million | $13.3 million |
| Baldwin, Florida | $12.3 million | $12.0 million |
| Port Angeles, Washington | $8.2 million | $7.8 million |

92. With respect to the Augusta, Georgia remediation site, Defendants falsely and misleading stated:

> Augusta, Georgia – SWP operated a wood treatment plant at this site from 1928 to 1988. The majority of visually contaminated surface soils have been removed, and remediation activities currently consist primarily of a groundwater treatment and recovery system. The site operates under a 10-year hazardous waste permit issued pursuant to the Resource Conservation and Recovery Act, which expires in 2014. . . . ***Liabilities are recorded to cover obligations for the estimated remaining remedial and monitoring activities through 2033***.[96]

93. With respect to the Spartanburg, South Carolina remediation site, Defendants falsely and misleadingly stated:

> Spartanburg, South Carolina – SWP operated a wood treatment plant at this site from 1925 to 1989. Remediation activities include: (1) a recovery system and biological wastewater treatment plant, (2) an ozone sparging system treating soil and groundwater and (3) an ion-exchange resin system treating groundwater. In 2012, SWP entered into a consent decree with the South Carolina Department of Health and Environmental Control which governs future investigatory and assessment activities at the site. . . . ***Liabilities are recorded to cover obligations for the estimated remaining assessment, remedial and monitoring activities through 2033***.[97]

[94] 2Q 2014 Form 10-Q (filed August 5, 2014) at 13.

[95] 3Q 2014 Form 10-Q (filed November 4, 2014) at 14.

[96] 2Q 2014 Form 10-Q (filed August 5, 2014) at 13. This false statement was repeated in substantially identical form in the 3Q 2014 Form 10-Q (filed November 4, 2014) at 14.

[97] 2Q 2014 Form 10-Q (filed August 5, 2014) at 13-14. This false statement was repeated in substantially identical form in the 3Q 2014 Form 10-Q (filed November 4, 2014) at 14-15.

94. With respect to the East Point, Georgia remediation site, Defendants falsely and misleadingly stated:

> _East Point, Georgia_ – SWP operated a wood treatment plant at this site from 1908 to 1984. This site operates under a 10-year Resource Conservation and Recovery Act hazardous waste permit, which is currently in the renewal process. In 2009, SWP entered into a consent order with the Environmental Protection Division of the Georgia Department of Natural Resources which requires that SWP perform certain additional investigatory, analytical and potentially, remedial activity. . . . ***Liabilities are recorded to cover obligations for the estimated remaining assessment, remedial and monitoring activities through 2033***.[98]

95. With respect to the Baldwin, Florida remediation site, Defendants falsely and misleadingly stated:

> _Baldwin, Florida_ – SWP operated a wood treatment plant at this site from 1954 to 1987. This site operates under a 10-year hazardous waste permit issued pursuant to the Resource Conservation and Recovery Act, which expires in 2016. Visually contaminated surface soils have been removed, and current remediation activities primarily consist of a groundwater recovery and treatment system. Investigation and assessment of other potential areas of concern are ongoing in accordance with the facility's Resource Conservation and Recovery Act permit. . . . ***Liabilities are recorded to cover obligations for the estimated remaining assessment, remedial and monitoring activities through 2033***.[99]

96. With respect to the Port Angeles, Washington remediation site, Defendants falsely and misleadingly stated:

> _Port Angeles, Washington_ – Rayonier operated a dissolving pulp mill at this site from 1930 until 1997. The site and the adjacent marine areas (a portion of Port Angeles harbor) have been in various stages of the assessment process under the Washington Model Toxics Control Act ("MTCA") since about 2000, and several voluntary interim soil clean-up actions have also been performed during this time. In 2010, Rayonier entered into an agreed order with the Washington Department of Ecology ("Ecology"), under which the MTCA investigatory, assessment and feasibility and alternatives study process will be completed on a set timetable, subject to approval of all reports and studies by Ecology. . . . ***Liabilities are***

[98] 2Q 2014 Form 10-Q (filed August 5, 2014) at 14. This false statement was repeated in substantially identical form in the 3Q 2014 Form 10-Q (filed November 4, 2014) at 15.

[99] 2Q 2014 Form 10-Q (filed August 5, 2014) at 14. This false statement was repeated in substantially identical form in the 3Q 2014 Form 10-Q (filed November 4, 2014) at 15.

> ***recorded to cover obligations for the estimated assessment, remediation, monitoring obligations and financial assurance that are deemed probable and estimable at this time***.[100]

97. These previously emphasized statements are materially false and misleading because:

> (a) Despite the studies performed and the reports submitted pursuant to the 2002 and 2004 Agreed Orders, which the Department of Ecology found to make "significant progress towards understanding the nature and extent of contamination at the [Port Angeles] Site," and the studies and reports submitted pursuant to the 2010 Agreed Order that set forth and described all possible remediation scenarios, Defendants did not meaningfully increase the environmental reserve for the site as a result of remediation costs until January 2015.
>
> (b) While Defendants attempted to deflect blame on the Port Angeles site increase due to a purportedly unique feasibility study, Rayonier was in fact actually required to submit another feasibility study to the Department of Ecology under the 2004 Agreed Order. The increase in the SWP Sites could not be attributed to any feasibility study or report that was submitted to regulators; the fact that the SWP Sites dramatically increased in unison with each other and with Port Angeles demonstrates that they were reviewed at once and not on an ongoing basis, as Defendants assured investors.
>
> (c) Defendants knew that their financial assurances for the SWP Sites were recently found to violate federal law, which forced Rayonier to obtain $41.7 million in complying financial assurance in 2010. Yet this assurance did not appear on Defendants' books until RYAM disclosed that it was required to purchase surety bonds in its 2Q 2012 Form 10-Q. Because a basic principle of purchasing insurance is knowing the value of the object that is being insured, Defendants should have known that the SWP Site-specific reserves were grossly understated and did not cover obligations through 2033.

## C. False Statements Regarding Accounting Estimates

98. In RYAM's June 18, 2014 Information Statement, Defendants falsely and misleadingly stated that:

> **Critical Accounting Policies and Use of Estimates**
>
> The preparation of financial statements requires SpinCo to make estimates, assumptions and judgments that affect SpinCo's assets, liabilities, revenues and expenses, and to disclose contingent assets and liabilities in SpinCo's Combined

---

[100] 2Q 2014 Form 10-Q (filed August 5, 2014) at 14. This false statement was repeated in substantially identical form in the 3Q 2014 Form 10-Q (filed November 4, 2014) at 15.

> Financial Statements. ***SpinCo bases these estimates and assumptions on historical data and trends, current fact patterns, expectations and other sources of information it believes are reasonable***. Actual results may differ from these estimates.[101]

99. This false and misleading statement was incorporated by reference into Rayonier's June 30, 2014 Form 8-K.[102]

100. In RYAM's Forms 10-Q filed during the Class Period, Defendants similarly falsely and misleadingly stated that:

> **Critical Accounting Policies and Use of Estimates**
>
> The preparation of financial statements requires us to make estimates, assumptions and judgments that affect our assets, liabilities, revenues and expenses, and disclosure of contingent assets and liabilities. ***We base these estimates and assumptions on historical data and trends, current fact patterns, expectations and other sources of information we believe are reasonable***. Actual results may differ from these estimates.[103]

101. These previously emphasized statements are materially false and misleading because:

(a) Defendants did not base RYAM's environmental reserves on these enumerated factors. Indeed, the fact that the environmental reserve fell every year since 2002 demonstrates that, in the 13 years prior to the sudden increase, Defendants did not consider any facts from any site that would have caused the reserve to increase.

(b) At Port Angeles, Defendants did not take into account, for example, the 2002, 2004, and 2010 Agreed Orders and the reports submitted pursuant thereto – including the feasibility study submitted pursuant to the 2004 Agreed Order. In fact, despite submitting a report to the Department of Ecology in June 2014 that contained all possible remediation scenarios, Defendants did not record an increase in the reserve based on the costs of these scenarios until January 2015.

---

[101] June 18, 2014 Form 8-K at Ex. 99.1 at 68. RYAM referred to itself as "SpinCo" in the Information Statement.

[102] June 30, 2014 Form 8-K at Item 9.01 (incorporating by reference June 18, 2014 Form 8-K at Ex. 99.1).

[103] 2Q 2014 Form 10-Q (filed August 5, 2014) at 18. This false statement was repeated in substantially identical form in the 3Q 2014 Form 10-Q (filed November 4, 2014) at 19.

(c) At the SWP Sites, Defendants had a history of violating federal law with respect to providing financial assurances. When the EPA ordered proper financial assurances to be obtained in 2010, the corresponding purchase of surety bonds was not disclosed until RYAM's 2Q 2014 Form 10-Q. Indeed, with the exception of the Baldwin site, every SWP Site recorded decreased liabilities in 2010 compared to 2009.

### D. False Statements Regarding Sarbanes-Oxley Certifications

102. RYAM's Forms 10-Q each contained certifications pursuant to Sarbanes-Oxley Section 302 that were signed by Defendants Boynton and Woo. Boynton and Woo each falsely certified:

> I, [Paul G. Boynton/Benson Woo], certify that:
>
> 1. I have reviewed this Form 10-Q of Rayonier Advanced Materials Inc.;
>
> 2. Based on my knowledge, ***this report does not contain any untrue statement of a material fact*** or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, ***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant*** as of, and for, the periods presented in this report . . . .[104]

103. RYAM's Forms 10-Q also contained certifications pursuant to Sarbanes-Oxley Section 906 that were signed by Defendants Boynton and Woo. Boynton and Woo each falsely certified:

> The undersigned [Paul G. Boynton and Benson Woo] hereby certify, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, that to our knowledge:
>
> 1. The quarterly report on Form 10-Q of Rayonier Advanced Material Inc. (the "Company") for the period ended June 28, 2014 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

---

[104] 2Q 2014 Form 10-Q (filed August 4, 2014) at Ex. 31.1 and 31.2. This false statement was repeated in substantially identical form in the 3Q 2014 Form 10-Q (filed November 4, 2014) at Ex. 31.1 and 31.2.

2. ***The information in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company***.[105]

104. These previously emphasized statements are materially false and misleading because:

(a) The Forms 10-Q materially understated RYAM's aggregate environmental reserve, as well as the reserve for each of its top 5 costliest sites.

(b) RYAM mislead investors into believing that the environmental reserve was calculated according to GAAP and took appropriate historical factors into account. As Defendants' refusal to consider Rayonier's violation of RCRA's requirements to maintain proper financial assurance, as well as its fraudulent disregard of the reports submitted to the Washington Department of Ecology under the 2002, 2004, and 2010 Agreed Orders demonstrated, Defendants simply ignored concrete information in violation of GAAP, which caused the environmental reserve to be materially understated.

## VI. DEFENDANTS' GAAP VIOLATIONS

105. The GAAP rules applicable to accounting for environmental liabilities are set forth in the Financial Accounting Standards Board's Accounting Standards Codification ("ASC"). In particular, ASC 410-30-25-1 requires the accrual of a liability if both of the following conditions are met:

(a) Information available before the financial statements are issued or are available to be issued … indicates that it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements, and

(b) The amount of the loss can be reasonably estimated.

106. Where such conditions are met, in order to avoid overstating assets, GAAP requires that the balance sheet contain a reserve for such future liabilities. Such reserve must be based on the company's best estimate of the expected costs of environmental remediation. ASC 410-30-30-8 provides that "[o]nce an entity has determined that it is probable that an

[105] 2Q 2014 Form 10-Q (filed August 4, 2014) at Ex. 32. This false statement was repeated in substantially identical form in the 3Q 2014 Form 10-Q (filed November 4, 2014) at Ex. 32.

environmental remediation liability has been incurred, the entity shall estimate that liability based on available information."

107. Further, ASC 410-30-30-9 states:

> Making the appropriate measurement of an entity's remediation liability involves the following issues:
>
> a. Costs that should be included in the measurement
>
> b. Whether the measurement should consider the effects of expected future events or developments, including discounting considerations
>
> c. How the measurement should be affected by the existence of other potentially responsible parties
>
> d. How the measurement should be affected by potential recoveries.

108. These GAAP rules are clear and would be known and understood by any competent accounting professional or executive charged with running a company with significant environmental liabilities.

109. At all relevant times, the Individual Defendants were fully familiar with the applicable GAAP provisions. RYAM's SEC filings and Rayonier's SEC filing prior to the spinoff set out rules for estimating environmental liabilities that are essentially the same as the foregoing GAAP provisions.

110. For example, RYAM's Form 10-K for the period ending December 31, 2014, which was signed by Defendants Boynton and Ruperto, stated that "[t]he Company records accruals for environmental liabilities based on its current interpretation of environmental laws and regulations when it is probable a liability has been incurred and the amount of such liability is estimable." This is essentially the same standard set forth in ASC 410-30-25-1.

111. The Form 10-K further states that in estimating its environmental liabilities, it is necessary to take into account:

> changes in the nature or extent of contamination, changes in the content or volume of the material discharged or treated in connection with one or more impacted sites, requirements to perform additional or different assessment or remediation, changes in technology that may lead to additional or different environmental remediation strategies, approaches and workplans, discovery of additional or unanticipated contaminated soil, groundwater or sediment on or off-site, changes in remedy selection, changes in law or interpretation of existing law and the outcome of negotiations with governmental agencies or non-governmental parties.

112. Defendants' knowledge of the relevant rules is reinforced by Rayonier's Form 10-K for the year ending December 31, 2013, which was signed by Defendant Boynton. This filing stated that in estimating remediation expenses for the sites at issue in this case, it was necessary for those estimates to take into account:

> changes in the nature or extent of contamination, changes in the content or volume of the material discharged or treated in connection with one or more impacted sites, requirements to perform additional or different assessment or remediation, changes in technology that may lead to additional or different environmental remediation strategies, approaches and workplans, discovery of additional or unanticipated contaminated soil, groundwater or sediment on or off-site, changes in remedy selection, changes in law or interpretation of existing law and the outcome of negotiations with governmental agencies or non-governmental parties.

113. RYAM's estimates of its environmental liabilities and its related reserve for such liabilities were grossly inadequate, failed to disclose the true extent of the enormous environmental liabilities facing RYAM, and failed to take into account all of the relevant information that RYAM knew, or was reckless in not knowing. Therefore, RYAM's financial statements violated GAAP, in particular each of the GAAP provisions cited above.

## VII. LOSS CAUSATION

114. Throughout the Class Period, the price of RYAM's common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above. When Defendants' misrepresentations and fraudulent conduct were disclosed to the market, the prices of RYAM's common stock fell precipitously as the prior inflation came

out of the Company's stock price. As a result of their purchases of RYAM's common stock during the Class Period at artificially inflated prices, Plaintiffs and the other Class members suffered economic loss, *i.e.* damages, under the federal securities law.

115. The decline in the price of RYAM's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of RYAM's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct:




116. The economic loss suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of RYAM's

securities and the subsequent decline in the value of RYAM's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII. STATUTORY SAFE HARBOR

117. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about then-current environmental remediation costs, which were central to RYAM's financial condition, and its internal controls concerning reserving and accounting, among others.

118. To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding RYAM's true environmental liabilities and adequacy related environmental reserves. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by RYAM were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

119. To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of RYAM who knew that the statement was false when made.

## IX. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

120. At all relevant times, the market for RYAM's common stock was efficient for the following reasons, among others:

121. RYAM's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

122. As a regulated issuer, RYAM filed periodic reports with the SEC and the NYSE;

123. RYAM regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

124. RYAM was followed by numerous securities analysts employed by major firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

125. As a result of the foregoing, the market for RYAM's common stock reasonably promptly digested current information regarding RYAM from all publicly available sources and reflected such information in the price of RYAM's common stock. All purchasers of RYAM common stock during the Class Period suffered similar injury through their purchase of RYAM common stock at artificially inflated prices, and a presumption of reliance applies.

126. A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## X. JURISDICTION AND VENUE

127. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

128. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

129. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. Additionally, the principal executive offices of Rayonier Advanced Materials are located within this District.

130. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## XI. CLASS ACTION ALLEGATIONS

131. Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of RYAM between June 30, 2014 and January 27, 2015, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of RYAM, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries

thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

132. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, RYAM shares were actively traded on the NYSE. As of January 27, 2015, there were over 42 million shares of RYAM common stock outstanding. The exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery. Class members who purchased RYAM common stock may be identified from records maintained by RYAM or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

133. Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

134. Lead Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

135. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

(c) whether Defendants acted with scienter; and

(d) the proper way to measure damages.

136. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## XII. COUNTS AGAINST DEFENDANTS UNDER THE EXCHANGE ACT

### COUNT I
**For Violations Of Section 10(b) Of The Exchange Act**
**And SEC Rule 10b-5 Promulgated Thereunder**
**(Against Defendants RYAM, Boynton, and Woo)**

137. Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

138. This Count is asserted on behalf of all members of the Class against Defendants RYAM, Boynton, and Woo for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

139. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

140. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in

acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of RYAM common stock during the Class Period.

141. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of RYAM common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, the impact that increasing environmental reserves to their true levels would have on RYAM's financials, the Company's accounting and reserving processes, and the Company's financial statements; (b) artificially inflate and maintain the market price of RYAM common stock; and (c) cause Lead Plaintiffs and other members of the Class to purchase RYAM common stock at artificially inflated prices and suffer losses when the true facts became known.

142. Defendants RYAM, Boynton, and Woo are liable for all materially false and misleading statements made during the Class Period, as alleged above.

143. As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which

presented a danger of misleading buyers or sellers of RYAM stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

144. Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for RYAM common stock, which inflation was removed from its price when the true facts became known. Lead Plaintiffs and the Class would not have purchased RYAM common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

145. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of RYAM common stock during the Class Period.

**COUNT II**
**For Violations Of Section 20(a) Of The Exchange Act**
**(Against Defendants Boynton, Ruperto, and Woo)**

146. Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

147. This Count is asserted on behalf of all members of the Class against Defendants Boynton, Ruperto, and Woo for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

148. During their tenures as officers and/or directors of RYAM, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of RYAM, these Defendants had the power and authority to direct the management and activities

of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. These Defendants were able to and did control, directly and indirectly, the content of the public statements made by RYAM during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

149. In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Boynton, Ruperto, and Woo had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions. Defendants Boynton, and Woo signed the Company's SEC filings during the Class Period, and were directly involved in providing false information and certifying and approving the false statements disseminated by RYAM during the Class Period. Defendants Boynton, Ruperto, and Woo were also directly responsible for controlling, and did control, the Company's violations of GAAP and other relevant accounting rules, and were directly involved in providing false information and certifying and approving the false statements disseminated by RYAM during the Class Period. As a result of the foregoing, Defendants Boynton, Ruperto, and Woo, as a group and individually, were controlling persons of RYAM within the meaning of Section 20(a) of the Exchange Act.

150. As set forth above, RYAM violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Amended Complaint. By virtue of their positions as controlling persons of RYAM and as a result of their own aforementioned conduct, Defendants Boynton, Ruperto, and Woo are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class

who purchased or otherwise acquired RYAM securities. Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of RYAM, each of these Defendants culpably participated in the material misstatements and omissions made by RYAM.

151. As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of RYAM common stock.

## XIII. PRAYER FOR RELIEF

152. WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

(a) Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b) Awarding all damages and other remedies available under the Exchange Act in favor of Lead Plaintiffs and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XIV. JURY DEMAND

153. Lead Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: September 11, 2015

Respectfully Submitted,

**SAXENA WHITE P.A.**

*/s/ Lester R. Hooker*

Maya Saxena (FL Bar No. 0095494)
Joseph E. White, III (FL Bar No. 621064)
Lester R. Hooker (FL Bar No. 32242)
Brandon T. Grzandziel (FL Bar No. 58732)
5200 Town Center Circle, Suite 601
Boca Raton, FL 33486
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com
brandon@saxenawhite.com

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
James J. Sabella
Brenda F. Szydlo
485 Lexington Avenue
New York, NY 10017
Telephone: 646-722-8500
Facsimile: 646-722-8501
jeisenhofer@gelaw.com
jsabella@gelaw.com
bszydlo@gelaw.com

*Counsel for Lead Plaintiffs The Pension Trust Fund For Operating Engineers and Oklahoma Firefighters Pension & Retirement System*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 11, 2015, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system. This system will send electronic notice of filing to all counsel of record by operation of the Court's electronic filing system.

/s/ *Lester R. Hooker*
Lester R. Hooker